[Crim. No. 19514. First Dist., Div. One. Feb. 18, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN JERREL BROWN, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Mark Fogelman, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**ELKINGTON, J.**—On a jury's verdict, defendant Benjamin Jerrel Brown was convicted of selling heroin in violation of Health and Safety Code section 11352. Judgment was entered upon the verdict and sentence to state prison was thereupon imposed, followed by suspension of execution of the sentence and an order granting probation. His appeal is from an "Order of the Superior Court" which we treat as from the judgment, as was manifestly intended. (See Witkin, Cal. Criminal Procedure (1963) Appeal, §§ 690-691, pp. 673-674.)

We consider the several contentions of the appeal as they are phrased by Brown:

I.

Contention: "The evidence of aiding and abetting was insufficient to support the jury's verdict."

"When the sufficiency of the evidence is challenged on appeal, the court must *review the whole record in the light most favorable to the judgment* to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational

trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468]; italics added.)

Reviewing the whole record in the light most favorable to the judgment we find the following evidence which the jury could reasonably, and presumably did, find to be true.

An undercover officer of the narcotics detail of the San Francisco Police Department was supplied with a recorded $20 bill by the department. He had stationed himself on a selected street corner, and was "looking around to see if anybody was going to approach me, or any potential runners"; a "runner . . . is . . . a person . . . who goes, gets the heroin, brings it back to you." After about five minutes, defendant Brown approached the officer and said, "Are you looking," which generally means, "Do you wish to purchase heroin?" The officer replied, "Yes, but nothing is happening." Brown said, "Well, what do you want?" The officer's response was, "Dope, man, bags [a bag is "a $10 quantity of rolled balloons of heroin"] . . . . Do you have any quarters?" Brown said "Yeah," and when the officer asked "Give me one," replied "Come on, let's go catch this broad." Brown then led the officer to a woman who was later identified as one Lucille Carson. Brown said to her, "Come on, take care of some business." The woman then asked the officer "how much did [he] need." He responded: "A quarter," meaning "a $25 quantity of heroin," but "you can get it for less if you are poor. Usually the standard price is 25 bucks." The officer then handed her the $20, and she handed him a balloon containing a quantity of heroin. The officer then departed. When he left, the woman and Brown were "walking together right down" the street.

By a radio transmitter the officer relayed information of the incident and a description of the couple and their location to other police officers stationed some distance away. Those officers went to the scene and arrested Brown in the company of Lucille Carson. The two appeared to answer the description furnished. The undercover officer was then called to the scene where he identified Brown and Lucille Carson as the persons instrumental in his purchase of the heroin.

Brown's defense and testimony were to the effect that a moment before he was arrested another man whom he did not know had parted,

and he had joined, company with Lucille Carson, and that he had mistakenly been identified as the other person.

■ "Aid and abet has been established as meaning 'to instigate, encourage, promote, or aid with guilty knowledge of the wrongful purpose of the perpetrator.' ... To assist in or contribute to the commission of the act with guilty knowledge is to aid and abet." (*People* v. *Camarillo* (1968) 266 Cal.App.2d 523, 532 [72 Cal.Rptr. 296] [cert. den., 395 U.S. 966 (23 L.Ed.2d 752, 89 S.Ct. 2111)].)

■ Brown's instant argument is that there was insufficient evidence "to support a finding beyond a reasonable doubt that [he] *intended to aid or encourage the perpetrator* in the commission of the crime" or, stated differently, to establish his "guilty knowledge."

We disagree. The evidence we have related abundantly supported the jury's verdict which impliedly found that Brown had the requisite guilty "intent," and "knowledge." (See *People* v. *Green, supra,* 27 Cal.3d 1, 55.)

## II.

Contention: "The trial court's instructions on aiding and abetting constituted reversible error because they allowed a determination of guilt based on a finding of mere presence."

As to this issue the trial court gave the jury the following instructions (the italics are ours):

(1) "All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who with knowledge of the unlawful purpose of the perpetrator of the crime aid and abet in its commission or, whether present or not, who advise and encourage its commission, are regarded by the law as principals in the crime thus committed and are equally guilty thereof." (CALJIC No. 3.00 (1976 rev.).)

(2) "A person aids and abets the commission of a crime if, *with knowledge of the unlawful purpose* of the perpetrator of the crime, he

aids, promotes, encourages or instigates by act or advice the commission of such crime." (CALJIC No. 3.01 (1979 rev.).)

· (3) "Mere presence of a person at the scene of a crime and failure to take steps to prevent a crime, of course, is insufficient in itself to show that such person is an aider or abettor."

(4) "The proof must show not only aiding the actor *but also sharing the criminal intent.* However, the presence is evidence to be considered in determining whether one is an aider or abettor."

(5) "*Presence may give encouragement, presence may give companionship*, and the conduct both before and after the offense are circumstances from which one's participation in the criminal intent may be inferred."

■ Brown's complaint is that the latter instruction's language, "'presence may give encouragement, presence may give companionship' erroneously enabled the jury to find guilt without finding more than mere presence."

The argument is unpersuasive. While we think the criticized language is awkward, and would better be left unsaid, elsewhere the jury were not only told (1) that "mere presence of a person at the scene of a crime ... is insufficient in itself to show that such person is an aider or abettor," but also (2) that the person must have acted "with knowledge of the unlawful purpose," and (3) that he must have shared "the criminal intent." The jury were patently not misled, and the trial court did not err.

### III.

Contention: "The trial court's instructions on aiding and abetting constituted reversible error because they allowed a determination of guilt without a finding that appellant *intentionally* aided the perpetrator, *i.e.*, that he had the *purpose* of aiding Lucille Carson."

Here, Brown's reliance is upon the recent case of *People* v. *Yarber* (1979) 90 Cal.App.3d 895, 912-917 [153 Cal.Rptr. 875]. That author-

ity holds (p. 916): "The jury in the [*circumstances of that case*] should have been instructed that a person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator, he *intentionally* aids, promotes, encourages or instigates by act or advice the commission of such crime." The trial court's instructions which we have quoted in part II above adequately fulfilled the requirement of *People* v. *Yarber.*

## IV.

Contention: "The trial court's permitting Inspector Corrales to give 'expert' testimony that appellant was guilty was reversible error."

■ "Although courts have not always used the same language, the decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435].)

"In *People* v. *Wilson*, 25 Cal.2d 341, 349 [153 P.2d 720] the Supreme Court said: 'There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case. "We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved.... Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in." ... In the present case there was no other practicable way of framing the questions if they were to serve the purpose of obtaining the benefit of the witness's expert knowledge as to matters on which enlightenment of the jury by the expert was proper....' [¶] Whether or not an opinion coincides with an ultimate issue is a neutral factor as far as its admissibility is concerned. If the question

cannot be further simplified, the opinion is admissible in spite of the fact that it 'calls for the ultimate issue.' Opinions as to value in eminent domain cases are a good example. If the question can be simplified, it should be. Thus the rule that an expert can testify whether a structure is built in accordance with standard and accepted construction methods and architectural practice, but not whether it is safe . . . exemplifies the many situations where opinion evidence is inadmissible, not because it goes to the ultimate issue, but because it goes beyond the point where the expert can assist the court as an expert. When he testifies to conclusions which even a lay jury can draw, the expert is no longer testifying 'on a question of science, art or trade' in which he is more skilled than the jury. . . . As Professor McCormick says: 'There is no necessity for such evidence, and to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witnesses.'" (*People v. Arguello* (1966) 244 Cal.App.2d 413, 417-419 [53 Cal.Rptr. 245] [cert. den., 386 U.S. 968 (18 L.Ed.2d 121, 87 S.Ct. 1052)], and see authority there collected.)

■ The police officers who testified for the prosecution at Brown's trial were experienced and knowledgeable in respect of the narcotic traffic. Under the foregoing authority they were properly permitted to testify to such matters as that the expression "Are you looking?" means "do you wish to purchase heroin," that "bag" means a quantity of heroin, and that the price of a "quarter" bag ordinarily ranged from $20 to $25. And we find no reasonable or legal objection to the following testimony given by one of the officers: "Q. Inspector, in your experience what is a 'runner'? . . . [A.] A runner is an individual who does not personally possess a quantity of heroin; however, he frequents the immediate area of people who do, and a runner will seek out customers, direct them to the person that is dealing and will be paid back either in money or, more normally, by them receiving a balloon themselves, frequently called 'four-for-one,' one for every four balloons the person sells through them they receive one balloon themselves, one balloon of heroin."

■ But then, over Brown's objection, the following questions and answers were permitted by the court: "Q. You heard him describe the nature of the initial contact that he, [an officer], had with the defendant on that day? A. Yes, sir, I did. Q. You also heard him testify about the transaction that the officer was involved in, that specifically

involved a transfer of a balloon from the—Lucille Carson to himself, did you not? A. Yes, sir. Q. Having that testimony in mind, do you have an opinion, based upon your experience and training, as to what role Mr. Benjamin Brown was playing in the transaction on June 16th of 1978? ... The Witness: Yes, sir.... Q. What is that opinion? A. *It's my opinion that the defendant, Ben Brown, was working as a runner for Lucille Carson.*" (Italics added.)

Under the instructions given by the trial court a "runner," as defined by the officer, was *necessarily* as guilty as the person to whom he directed another for the purchase of heroin. The latter answer given by the officer was tantamount to an opinion that Brown was guilty of the charged crime. The term "runner" having been defined for them, the jury were as qualified as the witness to determine whether Brown was "working as a runner for Lucille Carson." Error is demonstrated under the above authority.

## V.

Contention: "The trial court's reading of former CALJIC 22 (rev.), the instruction recently disapproved by the California Supreme Court in *People* v. *Brigham*, 25 Cal.3d 283 (1979) [157 Cal.Rptr. 905, 599 P.2d 100], constituted reversible error."

*Brigham* error is conceded by the Attorney General. He argues only that it was harmless. In *Brigham*, instructions on the principle of proof beyond a reasonable doubt, such as were given at Brown's trial, were declared erroneous.

*Brigham's* rule will be applied to cases "whose judgments have not become final as of the date on which [the] opinion becomes final." (25 Cal.3d, p. 292, fn. 15.)

The concept of proof beyond a reasonable doubt bore closely upon Brown's defense of mistaken identity. We find ourselves unable to declare, in the light of the whole record and the other error we have found, that the *Brigham* error was harmless according to the criteria of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (cert. den., 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70]), and the state's Constitution, article VI, section 13. The judgment will accordingly be reversed.

## VI.

The circumstances upon which Brown founds other claims of error will probably not recur at a retrial. We need not, and do not, consider them.

The judgment is reversed.

Racanelli, P. J., and Grodin, J., concurred.