Filed 3/27/13  P. v. Chang CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046233 |
| v. | (Super. Ct. No. 09CF3124) |
| CALI CHANG, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

Tony Faryar Farmani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Marissa Bejarano and Charles Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Cali Chang of possession of methamphetamine for sale (Health & Saf. Code, § 11378) and possession of methamphetamine with a firearm (Health & Saf. Code, § 11370.1, subd. (a)).  Chang challenges the sufficiency of the evidence to support the verdicts and complains the trial court erred when it allowed the prosecution's expert to testify that Chang possessed the drugs found by the officers.  Finding no prejudicial error, we affirm.

I

FACTS AND PROCEDURAL BACKGROUND

Sergeant Lorenzo Carrillo of the Santa Ana Police Department testified that on December 22, 2009, around 11:30 a.m. he conducted surveillance from an unmarked vehicle of a residence on West St. Andrews.  Officers received information that Christopher McDonald, a parolee with prior felony drug convictions, lived at the residence and may have violated parole.

Carrillo saw a woman, later identified as Melissa Hayes, standing by the front door, adjacent to the attached garage.  Two men, later identified as Hugo Magana and Juvenal Marquez, emerged from the garage, entered a white van parked in the driveway, and drove off.  Someone inside the garage rolled down the door.  Carrillo briefly followed the van, then radioed for other officers to stop the vehicle.

Officers Gustavo Moroyoqui and Justo Capacete, in a marked police unit, attempted to stop the van driven by Marquez, but the van sped off.  During a brief pursuit the van's occupants discarded blue plastic Ziploc baggies, a clear plastic sandwich baggie, and several small clear plastic baggies through the front passenger side of the van.  The van pulled over and officers found a glass drug pipe, $888, and a cell phone in Marquez's possession.   Three of the discarded baggies contained methamphetamine totaling about 4.5 grams, including packaging.

Meanwhile, Carrillo returned to his position near the residence.  He spotted a man, later identified as Chang, exit the garage, go to the sidewalk, and use a cell phone.

2

Chang looked around, then went back into the garage. He repeated this behavior about three times. Carrillo believed Chang was engaging in counter-surveillance measures.

Around 1:00 p.m., Rudolfo Lopez left the garage, went to a white truck parked in front of the house, opened the front door, reached inside, and retrieved a small item. Lopez then walked west along the sidewalk, crossed Fairview Street, and made contact with the driver of a waiting vehicle. He then proceeded back toward the house. Carrillo notified one of his standby teams, who arrested Lopez a few hundred yards from the house. The parties stipulated Carrillo observed Lopez "proceeding to a nearby parking lot and contacting the occupants of a Land Rover and conducting what appeared to be a possible hand-to-hand narcotic transaction. [¶] Officers Padilla and Panzika then contacted Lopez and searched the white truck, retrieving a scale and a trace amount of methamphetamine."

At approximately 1:30 p.m., Chang emerged from the garage, leaving the garage door open, entered an older model yellow Mercedes parked across the street, and drove off. Carrillo notified other officers on his team, seven or eight of whom arrived at the house about 15 minutes later.

Capacete and Moroyoqui stopped Chang shortly after he left the residence. Chang falsely claimed to be coming from a house several blocks away, even after Capacete confronted him with information about the surveillance. Capacete searched Chang and found $300 in crumpled bills in a jacket pocket, $80 in his wallet, and in his right front pocket a piece of white paper containing names, numbers, and dollar signs, some crossed out. One of the names on the paper was "Juvenal" and the numbers "3.5" and "220." Below the "220" was a "minus sign with a hundred down and then it says 'due 120.'" Capacete found a black handbag in the rear portion of Chang's car. The bag contained paperwork addressed to Chang, including a receipt for the purchase of a firearm.

3

According to Capacete, drug purchasers often pay approximately $220 for an "eight ball," which is an eighth of an ounce or 3.5 grams of drugs, and Capacete stated the van's occupants discarded drugs totaling 3.9 grams with packaging. Capacete also explained, "individuals who are involved in the sales of narcotics" frequently possess "firearms for protection."

After placing Chang in the back of their patrol car, Capacete and Moroyoqui returned to the house to conduct a parole check on McDonald. The officers looked into the garage through the open roll-up garage door and spotted what turned out to be a loaded "44 Marlin rifle" in a partially open gun case on the garage floor. The rifle appeared to be operable, although there was no evidence authorities test-fired it.

The officers knocked at the front door and Paul Blake, Jr. opened it. Officers had information that Blake Jr.'s father owned the house, but that Blake Jr. lived there and he had a 1996 felony conviction for drug possession.

Blake Jr. allowed the officers to enter after they explained their purpose for being at the house. Hayes, in the living room area carrying an infant, admitted she owned a handgun. The officers searched the house and found a .45-caliber Colt handgun in Hayes's bedroom, which they learned later had been stolen. The officers found no other contraband in the home. Blake Jr. later admitted he was holding the rifle in the garage for his father.[1]

The officers turned their attention to the garage, which had no direct access to the house. They found an open briefcase seven to 10 feet from the rifle. The briefcase contained a digital scale, numerous unused small plastic baggies, a padded mailing envelope addressed to Chang at a West Saint Gertrude Place address, and an envelope

---

[1]     Blake pleaded guilty to felon in possession of a firearm (former Pen. Code, § 12021, subd. (a)) and ammunition (Pen. Code, § former 12316, subd. (b)(1)) concerning the rifle found in the garage. We affirmed the judgment. (*People v. Blake*, Aug. 24, 2012, G045502 [nonpub. opn].)

addressed to "P.J. or Cali" at the St. Andrews address. The briefcase also contained a metal box with attached magnets. Inside the metal box, officers found two drug pipes, pills in baggies, and a clear plastic baggie containing approximately 20 grams of methamphetamine. Capacete stated it was "very common for [narcotics dealers] to have one of these containers to conceal narcotics and hide this container . . . underneath . . . their vehicle . . . ." No forensic evidence, including fingerprints or DNA, connected Chang to the items found in the garage. The officers found additional ammunition for the rifle on a garage shelf.

Capacete, based on his training and experience, explained a typical user might use 0.1 to 0.3 grams a day, but no one would possess 20 grams of methamphetamine for personal use. Capacete valued the methamphetamine in the metal box at $700 to $800. Capacete also noted the residence had surveillance cameras facing the street, a tactic criminals use to learn "if police are in the area . . . ."

II

DISCUSSION

A. *Substantial Evidence Supports the Convictions*

Chang challenges the sufficiency of the evidence to support the convictions. On appeal, the reviewing court must view the evidence in the light most favorable to the judgment. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) It is the trier of fact's exclusive province to assess witness credibility and to weigh and resolve conflicts in the evidence. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 (*Sanchez*).) We therefore presume the existence of every fact reasonably inferred from the evidence in support of the judgment. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.) The test is whether substantial evidence supports the conclusion of the trier of fact. (*Ibid*.; *People v. Johnson* (1980) 26 Cal.3d 557, 576.) Reversal is not warranted even if circumstances could be reconciled with a contrary finding. (*People v. Bean* (1988) 46 Cal.3d 919, 932-

5

933.) Consequently, a defendant attacking the sufficiency of the evidence "bears an enormous burden." (*Sanchez,* at p. 330.)

Chang contends the prosecution failed to prove he constructively possessed the methamphetamine found in the briefcase, or that he knew of its presence or character. He argues the evidence established only that he "was present at a place where someone else was selling drugs that did not belong to him and as to which he did not exercise any dominion or control."

The version of Health and Safety Code section 11378 in effect in December 2009 provided in relevant part, "every person who possesses for sale any controlled substance [including methamphetamine] shall be punished by imprisonment in the state prison." Health and Safety Code section 11370.1 provided, "every person who unlawfully possesses any amount of . . . a substance containing methamphetamine . . . while armed with a loaded, operable firearm is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years. [¶] As used in this subdivision, 'armed with' means having available for immediate offensive or defensive use."

Unlawful possession of a controlled substance for sale requires proof the defendant possessed the substance with the intent of selling it and with knowledge of both its presence and illegal character. (*People v. Harris* (2000) 83 Cal.App.4th 371, 374.) The elements include defendant (1) unlawfully possessed a controlled substance; (2) knew of its presence; (3) knew of the substance's nature or character as a controlled substance; (4) intended to sell the controlled substance; (5) the controlled substance was methamphetamine; and (6) the controlled substance was in a usable amount. (CALCRIM No. 2302.)

Chang argues no forensic evidence linked him to the items found in the garage and "[n]o solid evidence connected" him to the methamphetamine in the metal box in the briefcase. He concedes the envelopes found in the briefcase addressed to him

6

"might have indicated [he] owned the briefcase," but his ownership of the briefcase did not "justify an inference that he knew methamphetamine was concealed in an enclosed box in the briefcase." He emphasizes he did not have exclusive use or possession of the garage, and the trier of fact could not presume he was "aware of what may have been placed in the garage by one with access." He points to other potential culprits, such as Magana and Marquez, who officers found in actual possession of methamphetamine minutes after exiting the garage, and Lopez, who sold drugs in a hand-to-hand transaction, and whose truck contained a scale and a trace amount of methamphetamine. Chang notes there was no evidence he participated in a hand-to hand drug sale, made any admissions, or displayed evidence of drug use. Finally, he claims Blake's admission he controlled his father's rifle exonerates Chang.

Ample evidence supported the jury's conclusion Chang knowingly possessed the methamphetamine and the rifle was available for his use. Soon after Marquez and Magana drove away from the garage, they discarded methamphetamine in an amount approximating an "eight ball" while fleeing from police officers. After they left, Chang exited the garage and employed counter-surveillance measures. A short time later, Lopez left the garage, grabbed something out of his truck, and then apparently sold drugs in a hand-to-hand transaction. Chang was the last person to leave the garage and officers detained him a short time after he left. No one else was in the garage. Chang's pocket contained incriminating items, the most significant being a pay/owe sheet recording the recent sale of an eight ball to "Juvenal."

Chang lied to Capacete and Moroyoqui by claiming he came from a house several blocks away from the West St. Andrews residence. Jurors reasonably could infer guilty knowledge from Chang's counter-surveillance behavior and his attempt to disassociate himself from a residence where he knew drugs would be found. (*People v. Tripp* (2007) 151 Cal.App.4th 951, 956 [defendant's furtive acts and suspicious conduct indicating consciousness of guilt shows knowledge of substance's narcotic nature].)

7

Investigators found the methamphetamine in a magnetic drug-carrying container, located in an open briefcase containing correspondence addressed to Chang at the West St. Andrews address. Items found in a person's briefcase, like those found in a purse or wallet, are presumably controlled and possessed by its owner, especially when the person has just left the place where the briefcase is located and no one else is nearby.

This is not a case where the defendant simply possessed *premises* recently visited by others who could have brought in the contraband, or where evidence linked other highly suspicious people to the drugs at issue. (*People v. Showers* (1968) 68 Cal.2d 639, 644 [insufficient evidence the defendant possessed heroin found in ivy where evidence suggested another man dropped the drugs]; *People v. Monson* (1967) 255 Cal.App.2d 689, 691 [no reasonable inference the defendant possessed marijuana in a bedroom closet from the fact she lived in the apartment and the closet contained female garments]; *People v. Savage* (1954) 128 Cal.App.2d 123, 125 ["no legal inference possible" the defendant possessed marijuana found in a sofa simply because he rented room, where several guests had recently attended a party and sat on the sofa].) Nothing connected Lopez or the others who accessed the garage to the briefcase, metal box, or methamphetamine found inside it. Although circumstances suggested Lopez also may have been selling, or assisting Chang, that did not undermine the evidence against Chang. The jury reasonably could conclude Lopez kept his drugs in his truck, while Marquez and Magana appeared to be purchasers rather than sellers. Blake Jr. kept a rifle and ammunition in the garage, but nothing connected him or Hayes to the briefcase or drugs.

We have reviewed the cases cited by Chang on the issues of guilty knowledge and constructive possession and see no need to rehash them here. (See *People v. Stanford* (1959) 176 Cal.App.2d 388; *People v. Antista* (1954) 129 Cal.App.2d 47; *People v. Foster* (1953) 115 Cal.App.2d 866.) Suffice it to say none undermines our conclusion substantial evidence supported the jury's conclusion Chang knowingly

8

possessed the drugs found in the briefcase and the rifle in the partially open gun case near Chang's briefcase was available for his use.

B.    *Officer Capacete's Opinion Testimony Did Not Prejudice Chang*

During Officer Capacete's testimony, the prosecutor asked:  "Now, officer, putting together all of the pieces that you either saw yourself or you were told by other officers in this case, that being the fact that a man named Juvenal Marquez and Hugo Magana was seen exiting this garage at 2722 St. Andrew Place, they were later seen to have methamphetamine thrown from their car, Mr. Chang is seen coming in and out of that same garage, Mr. Chang is stopped in a vehicle and denies being at that house, Mr. Chang has a pay/owe sheet on it that we discussed earlier, as well as $300 in cash, as well as a sales receipt for a firearm; you found the firearm in the garage, you find 20 grams of methamphetamine in an open briefcase in a metallic box along with plastic baggies and a digital scale, along with the fact there are surveillance cameras at the time up at the residence – taking all that in totality, do you have a conclusion about whether or not Mr. Cali Chang was the one who possessed that methamphetamine for the purposes of selling it?"

Chang's lawyer objected to the question on the grounds it lacked foundation and invited an improper opinion.  Before the court ruled on the objection, Capacete answered "Yes."  After an unreported sidebar discussion,[2] the trial court sustained the objection as an improper hypothetical and invited the prosecutor to rephrase the question.

---

[2]    The court subsequently described the sidebar conversation:  "I had indicated that I sustained the defense objection because the way it was phrased.  It was phrased – it was not phrased necessarily as a hypothetical in the sense that we divorce ourselves from gathering an opinion on the defendant himself, his or her intent or mental state in regards to possession.  And certainly, there's plenty of case law that says experts in rendering expert opinions based on hypotheticals have to do so based on hypotheticals, not on the defendant himself.  And then, of course, there's all those lines of cases that deal with that."

The prosecutor then asked, "Officer, let me ask you this in a hypothetical form, not relating to the defendant here particularly." The prosecutor repeated the facts of the hypothetical omitting reference to Chang, and concluded by asking "do you have an opinion about whether or not this hypothetical person possessed that 20 grams of methamphetamine for the purpose of selling it." The court overruled Chang's objections, and Capacete testified he "formed the opinion on the following: this particular person is seen by a police officer in and out of this residence – the garage; this individual – two individuals leave this residence and eventually evade police and they're arrested for possession of narcotics the 3.9 grams. [¶] After the evade – after the evading of the police, these two individuals are under arrest; the individual that leaves the residence is contacted and is in possession of $300 of cash, which was in his pocket, the $80 in his wallet, the pay/owe sheet with the name of the individual that was just previously arrested for evading and transportation of a controlled substance, methamphetamine. [¶] In addition to that, the receipt for a firearm. Continuing through the investigation, the search of the garage revealed that there was a firearm located in plain view, a loaded rifle. In addition to that, a container which contained a little over 20 grams of methamphetamine with empty Ziploc baggies, a digital scale, in addition to that paperwork which led to the same name that was contacted on the traffic stop who contained the pay/owe sheet, as well as the surveillance cameras in the garage. [¶] Based on the totality of this, I formed the opinion that the individual was in possession of this narcotics for the purposes of sales." In answering the prosecutor's follow up questions, Capacete testified the presence of another person in the house who had a prior felony conviction and a handgun did not change his "opinion about whether or not the hypothetical person was the person who possessed this methamphetamine for sale."

Later during the prosecutor's redirect questioning of Capacete, the prosecutor asked, "So when you formed the opinion that the drugs found inside of the garage were possessed by the hypothetical person whose name is on the letters, who had

10

the pay/owe sheet in his pocket, you included the facts that there was another person [Lopez] that was seen doing what appeared to be a hand-to-hand transaction in the area, is that right?"

Counsel "again, object[ed] . . . to this entire line of questioning under the hypothetical is improper under [Evidence Code section] 801." The court overruled the objection.

Chang's lawyer complained Capacete had been allowed to "opine as to possession, not just as to whether the narcotics were" possessed for sale. Counsel stated, "the fact that [Capacete] says, 'him' instead of 'Cali Chang' doesn't make it a hypothetical." The officer was "not opining that these narcotics were possessed for the purpose of sales. He was opining that Mr. Chang, or the person who is obviously Mr. Chang in the hypothetical, possessed the narcotics." Chang's counsel complained it was "improper for an expert to opine as to dominion and control of a hypothetical situation." Counsel later clarified "[m]y objection was never to whether it was phrased as a hypothetical or not. My objection was the way in which the officer was being asked to render an opinion that was improper opinion for the jury."

Chang first complains Capacete answered "Yes" before the court sustained the objection to the prosecutor's initial question, and this fell into the category of error "beyond the curative powers of judicial admonition . . . . it was simply too late to 'unring the bell.'" He also complains the prosecutor immediately repeated "the same exact hypothetical, except that it [substituted] the word 'person' for Chang and 'individuals' for Marquez and Magana" and it would be "purely fictional to conclude that such minor and technical modifications cured the violation."

The Attorney General responds the prosecutor's revised "question was proper because it was posed as a hypothetical question and it was grounded in the facts of this case. Further, [Capacete's] testimony was proper expert opinion because whether a controlled substance is possessed for sale versus personal use is a matter sufficiently

11

beyond the common experience of an average juror."  Finally, she argues any error was harmless.  (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

"'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation].  Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  [Citation.]'"  (*People v. Vang* (2011) 52 Cal.4th 1038, 1044; Evid. Code, §§ 720, 801.)  The evidence is admissible even though it encompasses the ultimate issue in the case.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371; see Evid. Code, § 805.)  But "[e]xpert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness."  (*People v. Torres* (1995) 33 Cal.App.4th 37, 45;  "A witness may not express an opinion on a defendant's guilt.  [Citations.]  The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue.  [Citations.]  'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact.  To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'  [Citation.]"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77; *People v. Brown* (1981) 116 Cal.App.3d 820, 828-829 [narcotics expert's opinion the defendant was a drug runner inadmissible].)  "As a general rule, a trial court has wide discretion to admit or exclude expert testimony.  [Citations.]  An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. [Citation.]"  (*People v. Page* (1991) 2 Cal.App.4th 161, 187.)

It is of course "settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale. . . ."  (*People v. Hunt* (1971) 4 Cal.3d 231, 237.)  Capacete was free to express an opinion the drugs were

possessed for sale, and to base his opinion on the facts in this case, including that a pay/owe sheet was found on a person who had recently left the location where the drugs were found. But even assuming error, the evidence linking Chang to the methamphetamine was overwhelming. Capacete's opinion stating the obvious was not likely to have affected the jury's decision. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

## III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

13